The Honors, we're here today on what would ordinarily be a simple issue of statutory construction of whether the injury to the plaintiff, Mr. Flores, on an offshore drilling rig, which was floating but attached to land, is covered under the Longshore Harbor Workers Compensation Act. The reason it becomes less than a simple issue of statutory construction is because of what I call the Perini Grandfather Clause. And that is that there is a class of workers who may still recover benefits under that statute without proving maritime employment status. And that is the Perini Grandfather Clause if, in fact, they would have been The issue in this case is whether the injury which occurred on the Bigfoot oil platform while it was under construction and attached to land is an injury on navigable waters. We believe that the precedent in this circuit, specifically the Travelers' Indemnity v. Shea case, is definitive. And that is that if an object is floating and being used as a platform to do work and is not a vessel but attached to land, it is considered an extension of land. Doesn't Shea say permanently attached to land? It does, but later this court clarified in what I call the Work Platform cases, starting with Cook v. Belden, that permanence is not the test. Permanence might be enough, but if it's not a permanent attachment, it is still possible for a floating object attached to the land to be considered an extension of land. And thus we have the Cook v. Belden, Manual v. PAW Industries. But in Cook and Belden, the question, as I recall, was whether there was a maritime tort. And so the discussion focused not on the Perrini issue of whether the injury occurred on navigable waters, but whether working on a work platform would give rise to a maritime tort or Jones Act. That was the focus of the case, but the decisional point of the case harkened back to Cook v. Vallette Dry Dock Company, which was probably the seminal case on when an object attached to land is an extension of the land rather than a vessel. And what we have is, beginning with that case, a decision that if it is an extension of the land, then it is not a vessel. But you don't, I mean, when you look at Williams, Williams was a Coast Guard cutter that was on sea trials and the law is clear that a craft in that situation is not a vessel. The court held that if it was on, if the injury occurred on that craft in navigable waters of the United States, he'd be covered under the Longshoremen's Act. Correct. So doesn't that cut against the idea that it has to be a vessel? I think in comparison to Travelers' Dignity v. Shea, it actually demonstrates the two opposite ends of the spectrum, with Travelers being an injury on a floating object that is attached to land, whereas in the Avondale v. Williams case, the vessel was at sea. It was floating and not attached. I don't understand why you're saying that there was anything floating in the Sabine River from Shea. Wasn't the particular structure concrete, like concrete pilings from the structure all the way to the bed of the river connected for 18 years? So there were floating barges, so the barges themselves were floating and the barges themselves functioned as the actual work platform where that worker was injured. Those floating barges themselves were tied end-to-end to each other and some of them tied to concrete pilings along the way. But there were concrete pilings that had been in place for 18 years? You know what, I can't say for certain whether they were concrete pilings or wood pilings, but there were clusters of pilings. I can't say that for certain. So we know from Padovan, however you pronounce that case, that two cables is not sufficient to make something an extension of land. We know from Shea that concrete pilings, and you can confirm it and tell me if I'm wrong, I think they're concrete pilings, in Shea is sufficient. So your case involves eight cables. Where is the line between two cables, eight cables, and concrete pilings? And this is where I think the explanation in Cook v. Belden is very instructive. And in that case, this court said that permanence, the degree of permanence, is not the test. It is a factor, but it's not the test. The actual test is the function of the object on which the injury occurs. It doesn't have a maritime function. What's good about that is it ties together the history of different changes in opinions from Cope v. Valette dry dock all the way to the present. Because Cope, though it was originally interpreted and many times is interpreted to refer to the permanence of the attachment as being the key, it also stresses that in the court's opinion in that case, the dry dock did not function in the course of maritime commerce, and that was also considered to be a definitive reason. But Cook in those cases were concerned with whether the craft was a vessel. And we know from Williams that it doesn't have to be a vessel, right? Correct. But I think the point we're going back to in those cases is they decided that the objects were not vessels because they were attached to land. In other words, it wasn't the question of the determination of whether it was a vessel did not control the decision on attachment to land. It was the attachment to land that comes first and whether as an attachment to land, isn't it an extension of land or does it function as an object in maritime commerce? But if all we care about is the attachment to land, if you use your words, if the attachment to land question comes first, then why could we not use the exact same cables, the exact same utilities, the electric, et cetera, et cetera, et cetera was exactly at issue in this case, transform it from Bigfoot to a shipping container barge, right? So the same attachment to land question, as you say, comes first. And then the shipping container barge is all of a sudden, while it's being loaded and unloaded, say it's being unloaded and loaded for three years, just sitting in the Corpus Christi Bay, that somehow becomes an extension of land? That would seem hard to stomach. It doesn't. And the reason it doesn't- You think that is an extension of land? Well, to think of them as becoming an extension of land just for that reason doesn't seem to make logical sense. And the reason it doesn't seem to make logical sense is because we know what the purpose of the structure is that's attached to land. We know that its purpose is to function as a vessel to carry cargo or to carry passengers. The- Perini says that if the workman is injured on navigable water, then he's covered. Correct. So the question here, it seems to me, is whether- and Shea really points this out- is whether the water underneath the Bigfoot was withdrawn from navigation so that it was no longer navigable water. That's not the task for a vessel. Now, the language in Shea is revealing, and that was a case where it was a floating pier. Part of the pier was underwater, but the part of the pier that the guy was injured on was floating. And so the floating part of the pier had been attached to the underwater part, and it had been permanently attached for 18 years, and there was no intention to ever move it. And so the court said its permanent home was in the water, and the water below it had been completely removed from navigation. So as such, it was considered a war for a pier, and therefore, since the guy wasn't injured on navigable water, there was no Longshoreman Harbor Workers Act coverage. And that's not the inquiry in Cook where you're trying to determine if it's a vessel. Tell me how you- if you disagree, tell me how you- Well, first of all, let me comment that I find it interesting in going back through the history of determining the difference between an attachment to land and a vessel tied to shore. The courts have struggled over what the actual reasoning is for making that distinction. Some courts have discussed the degree of permanence of the attachment. I mean, doesn't it depend on the inquiry that you're making, though? I mean, if you're trying to determine whether somebody's injured on navigable water, why isn't it logical to have a different test for that than if you're trying to determine if something is a vessel that's engaged in maritime commerce? Well, I think having some uniformity across the spectrum of admiralty and maritime causes of action is of great benefit, and primarily because even the Longshore Harbor Workers cases that have found injury on navigable waters to be covered, they have harkened back to the very beginning of the Cope versus Vallette and actually the Blackheath and some of the other cases that deal with fixed structures or structures attached to land and whether they are vessels or extensions of the land. And here, it is the determination in those cases that the object is an extension of land that drives the decision for the rest of that case. And so I believe the starting point, even in the longshore coverage under pre-1972 concepts, needs to start with that question, is this an extension of the land under the historical precedent of admiralty law? And I suggest that it's not. Why don't we draw the line to whether the craft that the workingman is working on is permanently attached as opposed to temporarily attached? Now, in Shea, for example, there's never any intention to ever move that floating pier. Here, we know that as soon as the Bigfoot was constructed, it was going to be moved offshore. The attachment was not designed to be permanent. It was only until they finished the construction. That's correct, and we don't dispute that. But it does make you wonder whether the subjective inquiry into human intentions is a productive inquiry. Because, for example, in Travelers versus Shea, suppose there had been an injury on board one of those barges in the early days of its use when maybe there were only one or two barges attached and they had only been there for a month. But I thought your entire answer to my question about the container ship was about human intention and purpose. Right, and so the courts have had a hard time dealing with that, and they have actually fallen back in the Fifth Circuit to an objective view of the purpose of the structure. Wouldn't it be better just to say, I mean, the statutory text says, upon the navigable waters. And so, as Judge Davis pointed out, in cases like Shea, our question is, okay, well, is it upon the navigable waters? Well, no, because the navigable waters below the structure have been removed, in that case, by pilings. Wouldn't that just be an easier way to deal with all this? Well, it would be, but the United States Supreme Court says that's not the test. In Nacerima, Operating Company versus Johnson, and I'm quoting here, piers like bridges are not transformed from land structures into floating structures by the mere force from navigation. That is the determining factor. And if you look in all of these cases, the true determining factor is the purpose of the structure. Is it being used for a purpose that is somewhat related to maritime commerce? If so, a very high likelihood it's going to be considered an injury on navigable waters. But if its function is as an extension of land, in this case, we've got Bigfoot, which we argue was an extension of land while it was attached to shore under construction. It was destined to be an attachment to land. It was destined to be an artificial island, and the only time during which it was not attached to land in some way was while it was in transit to its final resting place. Okay. You've saved time for rebuttal. Thank you. Thank you very much. Mr. Kremins, on behalf of Henry Flores. Thank you, Judge Haynes, and may it please the court. The Longshore Act applies here as it did in Perini because Mr. Flores was injured while performing his regular duties on navigable waters. The injury occurred on navigable waters within the meaning of the Longshore Act because Mr. Flores was working on an object floating in the dock. I want to make three points explaining that conclusion. The first point is that a floating object does not have to be a vessel under maritime law for an injury on that object to have occurred on navigable waters within the meaning of the Longshore Act. There is no vessel requirement in the relevant statutory text, and the lack of a vessel requirement follows from this court's decision in Williams, as Judge Davis pointed out. The Williams court observed that vessel status isn't necessary for maritime tort jurisdiction and took as a given that an injury on a non-vessel could occur on navigable waters within the meaning of the Longshore Act. What about the argument that your opposing counsel made that if we're going to look at human intent, the final intent for Bigfoot was to be an artificial island in the middle of the ocean, and therefore if that's the issue, then why doesn't that make it not navigable waters? The issue is the status of the object at the time that the employee was doing the work and incurred and suffered the injury. At that time was the object floating upon navigable waters and temporarily moored to the dock, or was it an artificial island? It doesn't matter. It matters what's going on right at that moment. At that moment, it's temporarily moored, it's floating, it's la-di-da, and the fact that at some point it might be secured to the dock permanently or at some point it might become an artificial island, we don't care about that. We just care about the here and now. That's the argument. As I understand this court's cases and the Supreme Court's decision in Nassarima, which established the standard here, came a couple of years after Shea and resolved some of the issues that the the structure is permanently attached to land. So permanently affixed to the shore, permanently affixed to the sea bottom. And the way you make that determination is you look at the nature of the connections. So is it a bridge or for a pier? Is it driven into the sea bottom? Is it permanently attached to the land? And that answers the hypothetical that Mr. Manning gave about what if there was an injury in the first month that the outfitting pier in Shea was in operation. Well, same answer. Because of the nature of the attachments, the piling clusters throughout the length of the outfitting pier demonstrated permanence. And so you'd have the same result. In this court's decision in Pataven, it recognized that when you have a floating object that's only attached to the dock with cables, that that's a temporary connection. It's not a permanent connection. And so the structure is not an extension of land. So you think it's not a matter of the number of cables or the number of pilings, it's just cables are not permanent and pilings are? I think that the clear administrable standard here is the standard that the Supreme Court articulated in Nasarima, which is, is this permanently attached to land? And the only examples it gave of that were a bridge, a wharf, and a pier. Classic permanently attached things driven into the ground by pilings. They're permanently meant to be permanent. They don't float. Injuries occurring on those things occur on an extension of land. And the further we get away from bridges, wharfs, and piers into other types of objects, the test becomes more difficult to administer, which is why the test that the employer urges in this case would undermine the certainty in the law, would make it more difficult for employers and employees to figure out whether there's longshore coverage. If I could turn to the vessel cases that the employer relies on, Cook, Manuel, Cope, Judge Davis, as you pointed out, those cases deal with whether an object is a vessel under maritime law for purposes of the Jones Act, for purposes of the Doctrine of Unseaworthiness. Does the owner owe a duty of seaworthiness? You have to figure out whether the thing is a vessel. And the test for doing that looks to the transportation function. It's a different inquiry. It's different statutory schemes, different causes of action. It's just a different legal question from figuring out whether something is an extension of land, such that injuries on it are on or not on navigable waters. What about the constitutional argument of how far our constitutional reach goes on this question? There's different questions kind of all over the land and so on and so forth, so where does that all fit with the Constitution? Right. The injury here occurred on navigable waters, so it's the heartland of maritime jurisdiction. But this Court's decision in Jacksonville Shipyards went much further than that. It addressed the constitutionality of the landward extension of the Longshore Act in the 1972 Amendments and held that that was a permissible exercise of Congress's power under the Admiralty that it didn't even need to reach whether the Commerce Clause could have also justified Congress's action in the 1972 Amendments. So it's clear that an injury like this one doesn't get close to the line in determining the constitutionality of the Longshore Act as applied to an injury like this one. And there's no response in the reply brief that this argument is dropped. There's no explanation of how the argument could be squared with this Court's decision in Jacksonville Shipyards or with Perrini for that matter, which addressed a similar question of whether the constitutional limits on Admiralty torch jurisdiction that the Supreme Court had articulated in Eastern Airlines created a problem for applying the Longshore Act to a worker injured in the regular course of his duties on navigable waters. Can we talk about a slightly different question, which supposedly agree on the navigable, that it's on the navigable waters. Section 902, which is the definitional section of the Longshore Act, my understanding of Mr. Flores's argument is the term employee means any person engaged in maritime employment. That means working in the course of employment on navigable waters, which then means, and I assume Perrini requires us to read it that way, right? Because the definitional, even though they changed definitional provisions in the 1972 amendments, we're supposed to read those as not narrowing the concept of an employee from what existed prior to 1972. Right. Well, what Perrini also held is that work on navigable waters is maritime employment. Perfect. So what that means though, I think, is that 903A reads as follows. Compensation shall be payable under this chapter with respect to death or disability of an employee. That is, it should be payable for the death or disability results from an injury occurring on the navigable waters, which is a super weird way of writing a statute. Is that what the Supreme Court requires us to understand 903 to mean? In the employer definition, no, Your Honor. And here's why. The employer definition, when it gets to the language that describes the situs upon the navigable waters, it also includes the other adjoining land areas that were encompassed in the 1972 amendments. And so the argument is that there's a super fluidity problem because you have maritime employment, you have upon the navigable waters. Perrini tells us that regular work on navigable waters is maritime employment. So are the two phrases essentially doing the same thing? They're not because when you look at the rest of the definition and the inclusion of those additional land areas, somebody working on a pier, which is one of the additional land areas under the maritime employment. As Perrini recognized, as the Supreme Court's prior and subsequent decisions in this area have recognized, additional inquiries are necessary to figure out whether a worker in one of those land areas is engaged in maritime employment. So this Court's construction in Hullinghorst, the Supreme Court's construction in Perrini, the plain language of the statute, there's no super fluidity when you read the employer definition as a whole. At least it's applied to people who are on extensions of land or whatever you would call it. I said because you couldn't call it an extension of land. These land-based structures that are driven into the ground with pilings, the wharf and pier and all the other stuff. Right, read as a whole, the entire definition works. I'd also point out that, you know, there's an argument that what was Perrini saying when it said, of course, the person has to be an employer, you know, there has to be a statutory employer in order for coverage to be met. An additional point I want to make about that is that the employer requirement has additional teeth in a case involving, for example, a compulsory river pilot, which this Court addressed in Bach v. Trident Steamship. An individual independent contractor does not have a regular employer to which he can look for coverage under the Longshore Act. And so, you know, that's an example of where that statutory requirement does additional work. I see my time is about to expire. If the Court has additional questions, I'd welcome the opportunity to address them. Otherwise, we think the petitions for review ought to be denied. Okay. Thank you. Thank you. Mr. Boyle. I'm sorry. They split their argument between the two appellees, so we still have Mr. Boyle. Good morning, Your Honor. May it be so. I'll focus on a couple of things that the Court asked about. Judge Haines, you asked about when, what's the point at which we look at this structure? And the point under the Longshore Act is always at the time of the injury, because that's what we're looking at. When this person was injured, what was that structure serving as? So I think that's the simple answer to that. The constitutional question, the constitutional question is really kind of just a red herring, because the only way you can accept the constitutional question that this was outside maritime jurisdiction is if you accept the argument that this was an extension of land, because if it wasn't an extension of land, then it was in the navigable waters. If it was in the navigable waters, then it's clearly maritime. So I think the constitutional argument is... I just can't help but think if I'm walking on a pier in fall, I'm going to be in navigable water, but that's a law. So I guess I better not fall off a pier. To a certain extent, that is true, Your Honor. There is a case where the worker was on a pier and was originally found not covered, but because what happened was the crane came down and knocked him over into navigable waters on appeal, he was found covered. So if you're injured on the pier under pre-1972, you're out of luck. Right, and out of luck is probably a strange way to say it when you get knocked into the water by a crane, but... Well, it's got fine, I mean, there's just a lot of fine nuances to this area of the law. Absolutely, Your Honor. I want to respond briefly to what Mr. Manning said about what is important for marine coverage is the purpose that the clearly not relevant to perine coverage because if you look at the wide variety of uses to which things that have been covered have been found, have been put, have been found covered, the barge in Morganti was used for research, clearly not a maritime purpose. In Perini, Anaya, and Walker, the barges were being used as construction platforms, which is one of the very things that Mr. Manning says can't be covered under Perini. In the Caserma case, the platforms were serving as supports for generators, electrical generators. In the McCarthy case, a floating museum was an issue. That's a Second Circuit case. In the O'Rourke case, the structure was a railroad car float, and in Michigan Mutual, Caldero, and Taylor, the courts were examining gang planks and skids. So none of these things necessarily have maritime purposes. In fact, almost none of them that I've just mentioned do, but they were all found to be covered. So it is I think there was some question about the permanent connection to land, and I want to address two things with regard to that. One is the difference between something that is shoreside and something that is in the water. If you are shoreside, you are permanently connected to the land because you are not floating anymore. Judge Oldham, what you were saying is even though these steel barges were floating barges, once they are attached to pilings, they're not going to sink, so they're not floating anymore. Once you're out in a body of water, whether it's the Gulf of Mexico or the lake in Morganty, there's nothing to attach to. There's nothing to extend from, so you can't be an extension of land there, but you can still be floating, which is why the barge in Morganty was found to be covered. Okay, so what's your view on the piling? I think the pilings clearly make it permanently attached, Your Honor, and if you look at Herb's Welding, the difference between a floating structure and a fixed structure when you're out in the water is that the fixed structure is again on pilings. It's not floating anymore. It doesn't go up and down. So a floating pier would be what? A floating pier would still permanently attached to the land, Your Honor, as it was in Shea, and the reason is because there really is no such thing as a floating pier. If you look at Shea, it says these were barges that were end-to-end, but once you attach them to piling clusters... I guess I don't understand why the cutoff line isn't water versus land. I understand the law is what it is. We have to follow what the Supreme Court says. I understand the language of wharf and pier and all of that, but it just doesn't make a sense to me. When you're on the water, you're on the water. I agree, Your Honor, and if that's the standard, either standard... But I'm not trying to say that is the law. I just don't understand that, why we are even having this discussion. He's on the water. The problem is what kind of structure is he on? Is it connected and all that? I mean, to me, I grew up on the river. I knew when I was on land when I was in the water, and I don't know why that isn't the distinction, but I understand we have to follow the law and respect that. Well, I think it was, Your Honor, because the original administrative jurisdiction could only cover you when you were actually on the waters, and if there was something that was a permanent extension of land, like a bridge, it's got land on one side and land on the other, then you're not really floating on navigable waters anymore. I think that is the distinction, and the distinction between a floating pier and a non-floating pier, I'm not sure it really exists, because as in the Shea case, you do have these floating barges that extend out, but once you attach them to piling clusters, are they really floating anymore? Not really, because they're not going to go anywhere. If you get a hole in one of these barges, it's not floating. So Herb's welding specifically drew the distinction between a fixed platform and a floating platform. Yeah, I mean, my view of the law is not important. I have to follow what the law is, and so that's what we're trying to address. I'm sorry, I didn't mean to. No, that's okay. I think it's down a side river. But all right. Let me see if I have anything else. Does the court have any other? Oh, I want to briefly address the claimant's reliance, I mean, the employee's reliance on the cook. I'll just say one more thing. A bridge that connects land to land, to me, strikes me as different than a pier, which is not connecting land to land. It's connecting land to water, but that's fine. Again, I understand the law is what it is, so please move on, but I just wanted you to know that's why I have that. I think that the reason there is no distinction, Your Honor, is because they're both connected to the seabed, too. So they're not going to go anywhere. They're not floating. The employer's reliance on the cook case is a little bit strange, first of all, because, as Judge Davis pointed out, it is a Jones Act case, and the question was whether the structure involved was a vessel, which I think we can all agree is not relevant for Perini coverage. And the second thing is that in Cook, the court specifically noted that the claimant was seeking recovery in excess of the compensation provided by the Longshore Act. So it appears that, not only in Cook, but in Chahak, which was a seaworthiness case, and Atkins, which was also a vessel, the claimants had already received longshore compensation, and the only question was whether they could receive the other remedies that they were seeking in the absence of a vessel. Does the Court have any more questions for me? All right. Now, you were eager to come, Mr. Manning, and here you are. All right. I want to address first the question of why is there this arcane distinction between what's on land and what's on water, and why isn't the rule? I'm sorry. I don't mean to distract us from... Well, I think it's an important... If you want to address it, that's fine. I think it brings up, though, an important question, and that is, what did Congress mean, what do the courts mean by using the term unnavigable waters? And if you look through the history, including... We've cited some of the cases in our brief on what that term means and where it came from, and it actually was sort of the traditional shorthand version to describe within admiralty and maritime jurisdiction. And that is why the connection to maritime commerce keeps coming back over and over again in these cases where someone claims there's admiralty jurisdiction or longshore coverage, but there doesn't seem to be any apparent connection to maritime commerce. The Pate event case, actually, is one case that I think is instructive on this issue. This court there said that it wasn't going to affirm the use of land doctrine as the exclusive basis to affirm the dismissal in that case, but it did so on the additional determination, that is, a two-pronged test, that there was no substantial connection with maritime activities or interests. If they were suing for maritime tort. Right. And it wasn't a question of coverage under the longshoreman's act. And if the court determines that extension of land cases in other maritime and admiralty areas is not applicable to the longshoreman's harbor worker compensation act, then my argument doesn't hold water. I was just waiting to say that. Yes. But if there is a connection, if there is to be uniformity in determining what is an admiralty, then my argument is right on point. But doesn't it make sense that Congress wanted, they wanted to establish a situs test for coverage under the act. These longshoremen would walk back and forth between the ship and the dock, and so, you know, they drew the line before 72 and said, the guy's injured on land, he's covered by the state act, and if he's injured on navigable water, he's covered under the federal act. So to me, what Congress was after in the Jones Act and maritime tort is different from that. They're not establishing a situs test. Again, I would just bring us back to what the term on navigable waters really means, and that, I think, really means within the admiralty and maritime jurisdiction, and that brings us back to having some connection to maritime commerce, which the longshoremen do have a connection to, even though they may not be engaged directly in maritime commerce, there is a connection. That is not the case in this situation where there is absolutely no connection between the injury, the Bigfoot, the activities being performed by Mr. Flores. There's no connection at all with maritime commerce. That's how you distinguish these maritime contract cases where something can occur on land, but because it's a maritime contract, it falls under that. You know, the Kirby and Baron line of cases. If we got into the maritime contract cases, we're in a completely... I don't think those are relevant directly to this, but they seem to be relevant to the constitutional question. Because of the connection to maritime commerce, and if there were no connection to maritime commerce, Congress wouldn't be able to govern them under admiralty jurisdiction, and there may be other provisions of the Constitution that would allow Congress to regulate those. But in this instance, in the Longshore Harbor Worker Compensation Act, courts have uniformly interpreted it to mean that Congress was attempting to exercise only the admiralty and maritime jurisdiction, and not powers under the Commerce Clause or some other provision of the Constitution. I also want to address the issue of cables versus pilings. That's kind of a distracting, almost a red herring in itself, because yes, the pilings are there, but how are the barges connected to the pilings? They're tied to the pilings by cables or ropes. Similarly to the way that Bigfoot, although it wasn't tied to pilings, it was tied directly to the land. And so in some ways, it had a better, more certain connection to the land than barges who were floating end-to-end for 750 feet into the water that were only tied to pilings. But so was the object in Padovan. Yes. It was tied directly to the land, right? Yes. And we said, upon the Navajo River. Yes. And this is why I think, if we look at the evolution of admiralty jurisdiction law under Executive Jett and Gruber, what we're seeing is that the Supreme Court is coming back to that two-pronged test that was used in Cope versus Valette, which is not just the permanence, but also the connection to maritime commerce. And that is becoming more and more the distinguishing factor. And it is, in fact, a distinguishing factor that Congress made very clear in its extension of the Longshore Harbor Workers Act to land-based injuries that were related to maritime commerce. They put that in the statute because they understood that to be part of the restrictions on their jurisdictional authority. I have little doubt we could all talk about this until the water took over. We could. Fortunately, this Court will have the final word. And, Your Honors, I just pray for the Court to find my favorite. Well, okay. That's an interesting ending. So thank you. The case is under submission, and we will take a 10-minute break.